**Thomas H. LAWRENCE**

v.

**NORTHWESTERN NATIONAL LIFE INSURANCE COMPANY.**

**Civ. No. JFM–88–2932.**

United States District Court, D. Maryland.

July 27, 1989.

Dennis J. Bodley, Baltimore, Md., for plaintiff.

Hugh K. Webster, Fehrenbacher, Sale, Quinn & Deese, P.C., Washington, D.C., for defendant.

## MEMORANDUM

MOTZ, District Judge.

Thomas H. Lawrence and his wife, Eileen, claim that Northwestern National Life Insurance Company ("NWNL") is liable under a health insurance policy which it issued to Mr. Lawrence for the payment of the medical expenses for the delivery of their child. NWNL asserts that Mrs. Lawrence was pregnant before its policy was issued and that coverage under the policy is therefore excluded under a "pre-existing condition" clause.

Mr. Lawrence initially instituted the suit in the Circuit Court for Prince George's County. NWNL removed the case to this Court on the grounds that Lawrence's claim arises under ERISA, and on November 14, 1988 this Court entered a memorandum and order denying a motion to remand filed by Lawrence. NWNL has now moved for summary judgment. It also seeks sanctions against Lawrence for failure to admit in response to a request for admissions that Mrs. Lawrence was pregnant before the effective date of the policy.

## FACTS

In June 1985, Thomas Lawrence terminated his employment with Pulte Homes, Inc., effective June 28, 1985, and accepted a position with Capital Homes, Inc., effective July 1, 1985. At the time Lawrence knew that his wife might be pregnant, and he was confronted with the decision as to whether to continue his old policy with Pulte Homes (which he was entitled to do for a period of time) or to switch to the NWNL group policy provided by Capital Homes. He chose the NWNL policy, and it is undisputed that the effective date of that policy was July 1, 1985. The policy included pregnancy within the term "sickness" but excluded coverage for any "sickness ... existing prior to becoming insured...."

In June the Lawrences learned that Mrs. Lawrence might be pregnant. On June 13, 1985, she was told by her doctor, Paul Valove, that the result of her serum pregnancy test was positive. On June 18, 1985, she had a quantitative pregnancy test which showed that she was in the fourth week of pregnancy. On June 20, 1985, a second quantitative pregnancy test showed that Mrs. Lawrence was five weeks pregnant. In addition, on June 21, 1985, Dr. J.D. Stahl performed a sonogram on Mrs. Lawrence which reflected a "gestational sac."

On June 24, 1985 Mr. and Mrs. Lawrence met with Dr. Valove. The Lawrences recall that Dr. Valove told them that he could not at that time state "conclusively" that Mrs. Lawrence was pregnant and that he told them that "he wanted ... [Mrs. Lawrence] to go back and have another sonogram to be positive." [1]

---

1. The deposition testimony of Dr. Valove brings the Lawrences' recollections into question. Al-

## DISCUSSION

### I.

■ The Maryland Court of Appeals, following numerous other jurisdictions, has adopted a two-pronged test for determining whether a "sickness" (here, pregnancy) pre-existed the effective date of an insurance policy. "[T]he illness, disease or disability will ordinarily be deemed to have its inception when it first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease." *Mutual Benefit Health & Accident Ass'n v. Goldfinger*, 254 Md. 272, 254 A.2d 683, 687 (1969).

The origins of this test provide some insight into its meaning. The first prong apparently arose out of recognition of the fact that a condition of *disease* might pre-exist the issuance of a policy but that *a sickness* resulting from that disease would not become "manifest" or "active" until a later time. *See* 10, Couch, Cyclopedia of Insurance Law (2d Ed.1962), Section 41:814 at 639 (quoted in *Goldfinger*, 254 A.2d at 686–87). Courts considered it to be unfair to exclude from coverage sicknesses arising from a condition which was entirely latent and unknowable to the insured at the time a policy was issued. The reasons for the test's second prong—the presence of distinct symptoms which would lead a physician to diagnose the disease with reasonable medical certainty—are somewhat less obvious. Two, however, are apparent: (1) to prevent unfairness to insurers in cases where a physician was attending the in-sured at the time the policy was applied for, and (2) respect for the traditional principle that insurance provides protection only against fortuitous events, not ones which are certain to happen.[2]

Against this background the present case might be seen as being somewhat paradoxical. It is ordinarily the second prong of the test which is more restrictive since presumably a physician can diagnose a condition on the basis of less evidence than is necessary to make the condition manifest to a reasonable lay person. Here, if the Lawrences' recollections are accurate, the reverse may be true. According to their deposition testimony Dr. Valove told them that "in ... [his] professional opinion ... his records would show that the determination was inconclusive." It could be argued that if that is what Dr. Valove said, it necessarily follows that no "distinct symptom or condition" existed "from which one learned in medicine ... [could] with reasonable accuracy diagnose the ... [pregnancy]." However, prior to seeing Dr. Valove on June 24, 1985, the Lawrences had been advised of three positive pregnancy tests and a sonogram showing a gestational sac. These test results constituted more than sufficient evidence to any reasonable lay person that Mrs. Lawrence's pregnancy was "manifest" or "active." Since her pregnancy was pre-existing if either of the prongs of the test are met, NWNL is entitled to the summary judgment which it seeks.

### II.

■ NWNL next contends that it is entitled to sanctions pursuant to Rules 37(c)

---

though he does not recall specifically what he told the Lawrences on June 24th, he believes, based upon his notes and general practice, that he told them that Mrs. Lawrence was pregnant. Otherwise, he would not have had Mrs. Lawrence come in for a new obstetrical visit as he did. Of course, for summary judgment purposes the facts must be assumed to be as the Lawrences recall them.

**2.** Apparently concerned about the unfairness which might be caused by the second prong of the test to an insured who was not being attended by a physician and who had no reason to know of his sickness prior to the issuance of his policy, at least one court has adopted a single-prong test whose focus is entirely from the perspective of a reasonable lay person. Under this test "a condition, not otherwise diagnosed, is manifest when the insured knew or should have know of the existence of his illness because he was experiencing symptoms that would lead a reasonable person to seek a medical diagnosis." *American Sun Life Insurance Co. v. Remig*, 482 So.2d 435 (Fla.App.1985). Cases which include the test's second prong usually involve a factual scenario in which the insured was being seen by a physician around the time he was applying for the policy. *See, e.g., Inter–Ocean Insurance Co. v. Engler*, 632 S.W.2d 459, 461 (Ky.App.1982); *McDaniel v. State Farm Mutual Insurance Co.*, 3 Kan.App.2d 174, 591 P.2d 1094 (1979).

and 11 of the Federal Rules of Civil Procedure because Lawrence refused to admit in response to a request for admission that his wife was pregnant on or before June 18, 1985. The request and response were as follows:

[request]

4. The medical expense which Plaintiff seeks from Defendant relate to a pregnancy which existed on or before June 18, 1985...."

[response]

4. The Plaintiff is unable to truthfully admit or deny Request No. 4 because, after reasonable inquiry, the information known or readily available by Plaintiff is insufficient to enable Plaintiff to admit or deny the Request.

Lawrence's response was inaccurate. He has admitted in his deposition that he was aware as early as July 5, 1985 that Mrs. Lawrence became pregnant prior to June 18, 1985 (when Dr. Valove learned the results of a second sonogram). If he knew that fact in July 1985, he obviously also knew it in 1988 when he responded to the request for admissions. However, Lawrence's reluctance to admit a fact posed in a form which he believed could be misleading is understandable. Furthermore, the costs which NWNL seeks to recover as a result of Lawrence's failure to admit are the expenses of taking the depositions of Dr. Valove and Dr. Stahl. NWNL contends that these depositions would have been unnecessary if the request for admission had been admitted. This Court does not agree. Even if Lawrence had made the requested admission, the depositions of the doctors still should have been taken to elucidate the issues presented, specifically in regard to what the Lawrences had been told. Therefore, NWNL suffered no damage from the failure to admit.

A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein, it is this 27th day of July 1989

ORDERED

1. Defendant's motion for summary judgment is granted and judgment is entered in its behalf against plaintiff; and

2. Defendant's motion for sanctions is denied.